# UNITED STATES DISTRICT COURT
for the
Western District of Oklahoma

**FILED**
APR 03 2019
CARMELITA REEDER SHINN, CLERK
U.S. DIST. COURT, WESTERN DIST. OKLA.
BY_____, DEPUTY

In the Matter of the Search of  )
*(Briefly describe the property to be searched*  )
*or identify the person by name and address)*  )   Case No. M-19-174-STE
)
SPRINT cellular telephone 214-418-2574, with IMSI:  )
310120059494450.  )
)

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A, which is incorporated by reference herein.

located in the _____Western_____ District of _____Oklahoma_____, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, which is incorporated by reference herein.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
☑ evidence of a crime;
☐ contraband, fruits of crime, or other items illegally possessed;
☑ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 846 | Drug Conspiracy |
| 18 U.S.C. § 2118(b) | Burglary Of a Business Registered with the Drug Enforcement Administration |

The application is based on these facts:
See Affidavit, attached hereto

☑ Continued on the attached sheet.
☐ Delayed notice of ____ days (give exact ending date if more than 30 days: _____) is requested
    under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
Applicant's signature

GERARD DAUPHINAIS, DEA Special Agent
Printed name and title

Sworn to before me and signed in my presence.

Date: 4/3/19

_____
Judge's signature

City and state: Oklahoma City, Oklahoma

SHON T. ERWIN, U.S. Magistrate Judge
Printed name and title

## ATTACHMENT A

### PROPERTY TO BE SEARCHED

This warrant applies to records and information associated with the cellular telephone assigned call number **214-418-2574**, with **IMSI:310120059494450** ("the **SUBJECT PHONE**"), which is stored at premises controlled by **SPRINT**, a wireless telephone service provider headquartered at 6480 Sprint Parkway, Overland Park, Kansas.

## ATTACHMENT B

## **PATICULAR THINGS TO BE SEIZED**

**Information to be Disclosed by the Provider**

To the extent that the information described in **Attachment A** is within the possession, custody, or control of the Provider, including any information that has been deleted but is still available to the Provider or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Provider is required to disclose to the government the following information pertaining to the Account listed in **Attachment A** for the time period **December 2, 2017 through December 11, 2017**:

a. The following information about the customers or subscribers of the Account:

　i. Names (including subscriber names, user names, and screen names);

　ii. Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

　iii. Local and long distance telephone connection records;

　iv. Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

　v. Length of service (including start date) and types of service utilized;

　vi. Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity

    Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

  vii. Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address); and

  viii. Means and source of payment for such service (including any credit card or bank account number) and billing records.

b. All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the Account, including:

  i. the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses); and

  ii. information regarding the cell tower and antenna face (also known as "sectors") through which the communications were sent and received.

## II. Information to be Seized by the Government

All information described above in Section I that constitutes [evidence, fruits, contraband, and instrumentalities] of violations of 21 U.S.C. § 846; 21 U.S.C. § 841(a)(1); 18 § U.S.C. 2118(b); and 18 § U.S.C. 2 involving **MONSERRATE** during the period **December 2, 2017 through December 11, 2017.**

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Provider in order to locate the things particularly described in this Warrant

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH THE CELLULAR DEVICE ASSIGNED CALL NUMBER **214-418-2574**, WITH **IMSI: 310120059494450**, THAT IS STORED AT PREMISES CONTROLLED BY **SPRINT**. | Case No. _____<br><br>**Filed Under Seal** |

## AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT

I, Gerard Dauphinais, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application for a search warrant for information associated with a certain cellular telephone assigned call number **214-418-2574**, with **IMSI: 310120059494450** ("the **SUBJECT PHONE**"), which is stored at premises controlled by **SPRINT**, a wireless telephone service provider headquartered at 6480 Sprint Parkway, Overland Park, Kansas. The "SUBJECT PHONE" is subscribed to by Julian Stachniewicz, 8217 County Road #106, Grandview, Texas, but utilized by Danielle **MONSERRATE**. I believe **MONSERRATE** is utilizing the "SUBJECT PHONE" because an indices check of **MONSERRATE** lists the "SUBJECT PHONE" as her cellular telephone as well as associating her with the same subscriber address as the "SUBJECT PHONE". In addition, on multiple occasions in the last two years, **MONSERRATE** has given the "SUBJECT PHONE" as her contact telephone to law enforcement. The information to be searched is described in the following paragraphs and in **Attachment A**. This affidavit

is made in support of an application for a search warrant under 18 U.S.C. § 2703(c)(1)(A) to require **SPRINT** to disclose to the government copies of the information further described in Section I of **Attachment B**. Upon receipt of the information described in Section I of **Attachment B**, government-authorized persons will review the information to locate items described in Section II of **Attachment B**.

2. I am a Special Agent with the Drug Enforcement Administration (DEA), United States Department of Justice, and have served in that capacity since 1996. I am currently assigned to the Tactical Diversion Squad (TDS) at the Oklahoma City District Office (OCDO) located in Oklahoma City, Oklahoma. In January 1997, I completed approximately sixteen (16) weeks of training at the DEA Basic Agent Academy in Quantico, Virginia that instructed your affiant on narcotics investigations, use of confidential sources, surveillance, interviews and interrogation, proper search and seizure, and arrest procedures as required to become a Special Agent with the DEA. Prior to the DEA, I was a police officer with the Los Angeles Police Department for two years and have experience investigating many types of criminal conduct.

3. During my career as a DEA Special Agent, I have investigated violations of the Controlled Substances Act involving illegal narcotics trafficking. Through these investigations and the training mentioned above, I have become familiar with investigative methods and techniques regarding drug trafficking and money laundering. I am familiar with and have participated in standard methods of investigation, including, but not limited to, visual surveillance, questioning witnesses, the use of search and arrest

warrants, the use of informants, the use of electronic surveillance, the monitoring and analysis of cellular telephone usage and data, and the use of undercover agents. I am familiar with the methods of operation and terminology used by drug traffickers as well as methods of laundering drug trafficking proceeds. I have experience debriefing defendants, witnesses, confidential sources, and other persons who have knowledge of the distribution and transportation of controlled substances. I know from training, experience, and experiences related to me by other agents that persons involved in drug trafficking frequently utilize cellular telephones to further the distribution of illicit and/or counterfeit illicit substances.

4.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter. As a Special Agent with the DEA, I am vested with the authority to investigate violations of Titles 21 and 18 of the United States Code. The facts contained in this affidavit were discovered by me or related to me by other Law Enforcement Officers.

5.  Based on the facts set forth in this affidavit, there is probable cause to believe that violations of 21 U.S.C. § 846; 21 U.S.C. § 841(a)(1); 18 § U.S.C. 2118(b); and 18 § U.S.C. 2 have been committed, are being committed, and will be committed by **Danielle MONSERRATE**. There is also probable cause to search the information described in **Attachment A** for evidence, instrumentalities, contraband, or fruits of these crimes as further described in **Attachment B**.

## **PROBABLE CAUSE**

6. On December 3, 2017, at approximately 8:51 p.m., the Oklahoma City Police Department (OCPD) responded to a burglary alarm activation of Nichols Hills Drugs, located at 7538 Berkley Avenue, Oklahoma City, Oklahoma. Upon arrival, the OCPD responding officer observed the front door of the business had been pried open with what appeared to be a crowbar. There was blue paint transfer on the door frame and the lock to the door had been popped out of the socket. An employee of the business responded and advised that there was video surveillance but the employee was unable to get the system operational at that time. A cursory search of the location revealed several bottles of Adderall (a Scheduled II Controlled Substance) had been taken.

7. On December 5, 2017, Nichols Hills Drugs submitted a "Report of Theft or Loss of Controlled Substances" to the DEA to document the inventory taken during the burglary two days prior. According to the report, approximately 3,200 pills of Hydrocodone, approximately 400 pills of Adderall, and approximately 200 pills of Amphetamines were taken from the pharmacy during the burglary. All the above pills are Schedule II Controlled Substances according to the Controlled Substances Act of 1970. OCPD conducted a follow-up interview with the owner of Nichols Hills Drugs, Arrash Asgari. Mr. Asgari related the following to the OCPD. Mr. Asgari stated that when he viewed the surveillance video of the burglary, he observed a male wearing a dark hoodie and camo mask enter the pharmacy carrying an object. Mr. Asgari stated the male can be heard saying "I'm in" on a cellphone or walkie-talkie like device on the

video. The male walked directly to the shelf containing the Adderall pills and began dumping them into a trash can. The male then proceeded to the shelf containing the Hydrocodone pills and dumped them into the trash can. The male then exited the pharmacy after only being inside for less than a minute.

8. OCPD also acquired photographs of a suspect vehicle (a blue pickup truck resembling a Ford F-150) from video surveillance taken from the bank next door to the pharmacy. In one of the photographs, the truck appeared to have its tail gate down while driving away from the location at the time of the burglary of the pharmacy.

9. On December 9, 2017, at approximately 1:26 p.m., the State of Missouri Phelps County, Sheriff's Department (PCSD) conducted a traffic stop on a blue Ford F-150 pickup truck for a traffic violation. At the time of the traffic stop, the Ford F-150 was towing a white passenger vehicle, which was determined to be a rental car. Upon contacting the F-150, PCSD identified the driver as Jeremy BALLEW and the passenger as Danielle **MONSERRATE**. BALLEW identified **MONSERRATE** as his girlfriend and advised the PCSD that he and **MONSERRATE** were going to visit **MONSERRATE's** sister in St. Louis, however neither of them knew the sister's address in St. Louis. Also, BALLEW stated they would be visiting for five days and staying in a hotel while visiting. However, **MONSERRATE** stated they would only be staying one night and then returning home. When advised it was unusual to see a rental car being towed, BALLEW advised the PCSD that **MONSERRATE** (in whose name the vehicle was rented) would use the rental car to go shopping while BALLEW would keep the F-

150 to "hang out" with **MONSERRATE**'s girlfriends' husbands. The PCSD received consent to search the F-150 and the white rental car. During the search, the PCSD discovered two sandwich baggies containing numerous pills. BALLEW told the PCSD the pills were morphine pills and that they were given to him but he did not say from whom. Based on the discovery of the pills, BALLEW and **MONSERRATE** were transported to the PCSD for further investigation.

10. Enroute to the PCSD, BALLEW agreed to be honest if **MONSERRATE** did not get arrested. After being advised of his Miranda Rights, BALLEW made the following voluntary statements. BALLEW stated they were enroute to the St. Louis area to commit pharmacy burglaries. BALLEW stated that his method of operation was to "Google" the nearest pharmacy, wait until sun down, and then make entry into the pharmacy using a crow bar. BALLEW stated the white rental car was operated by **MONSERRATE** to act as a lookout during the burglary. BALLEW then gave a written statement describing his burglary of Nichols Hills Drugs which BALLEW referred to as his "most recent" burglary. BALLEW stated he was unaware of how many burglaries he had committed, but stated it was definitely over 20 burglaries. BALLEW stated he has also committed burglaries in Kansas City, Missouri and Illinois. BALLEW confirmed that the pills in the second baggie were from the "last Oklahoma burglary" which BALLEW stated was Nichols Hills Drugs. BALLEW stated he would cooperate with the OCPD regarding the Nichols Hills Drug burglary and that he left his tailgate down on his

truck (per OCPD seen in video as truck departed location) to conceal the license plate of the blue truck.

11. The blue F-150 BALLEW was driving at the time of his traffic stop by PCSD matched the blue pickup truck seen on video surveillance leaving the scene of the Nichols Hills Drug burglary. In his written statement about the burglary of Nichols Hills Drugs, BALLEW admitted to prying open the front door of the pharmacy. BALLEW ran to the first shelf and took the Adderall and then ran to the second shelf to take the Hydrocodone. BALLEW stated he took a "couple thousand Hydrocodone".

12. In paragraph 10, BALLEW admitted that the white rental car, rented by **MONSERRATE**, was operated by **MONSERRATE** and used as a lookout when BALLEW commits a burglary. In paragraph 7, Mr. Asgari stated the video surveillance system captures the hooded male (BALLEW based on his admission) enter the pharmacy and exclaim "I'm in" on a communication device which indicates BALLEW was communicating with another individual outside of the pharmacy to advise that individual that he was inside the pharmacy. Based on BALLEW's statement that **MONSERRATE** uses the white rental car to act as a lookout for him during burglaries and that Nichols Hills Drugs was his most recent burglary, and the fact that BALLEW was towing the white rental vehicle behind the blue Ford F-150 when he we was detained by the PCSD six days later, I believe BALLEW was communicating with **MONSERRATE** on the **"SUBJECT PHONE"** when he stated "I'm in" as she was acting as the lookout during the Nichols Hills Drugs burglary. Toll records obtained from **SPRINT** on the "SUBJECT

7

PHONE" confirm that the "SUBJECT PHONE" was being used at or around the time of the Nichols Hills Drugs burglary. I believe **MONSERRATE** was sitting in the white vehicle outside of the pharmacy and acting as the lookout for BALLEW during the burglary of Nichols Hills Drugs while using the "SUBJECT PHONE". I believe the cell-site information to be disclosed by **SPRINT** for the time period identified in **Attachment B** is likely to constitute evidence of the crimes under investigation and indicate that **SPRINT** to whom this warrant is directed provides service for the "**SUBJECT PHONE**"

13.     In my training and experience, I have learned that **SPRINT** is a company that provides cellular telephone access to the general public. I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate information about the locations of the cellular telephones to which they provide service, including cell-site data, also known as "tower/face information" or "cell tower/sector records." Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data provides an approximate location of the cellular telephone but is typically less precise than other types of location information, such as E-911 Phase II data or Global Positioning Device ("GPS") data.

14. Based on my training and experience, I know that **SPRINT** can collect cell-site data about the **SUBJECT PHONE**. I also know that wireless providers such as **SPRINT** typically collect and retain cell-site data pertaining to cellular phones to which they provide service in their normal course of business in order to use this information for various business-related purposes. I personally confirmed with **SPRINT** that it currently possesses the information requested in this order and identified in **Attachment B**.

15. Based on my training and experience, I know that wireless providers such as **SPRINT** typically collect and retain information about their subscribers in their normal course of business. This information can include basic personal information about the subscriber, such as name and address, and the method(s) of payment (such as credit card account number) provided by the subscriber to pay for wireless telephone service. I also know that wireless providers such as **SPRINT** typically collect and retain information about their subscribers' use of the wireless service, such as records about calls or other communications sent or received by a particular phone and other transactional records, in their normal course of business. In my training and experience, this information may constitute evidence of the crimes under investigation because the information can be used to identify the **SUBJECT PHONE**'s user or users, their location at the time of the **SUBJECT PHONE**'s use or the time of the criminal activity, and may assist in the identification of co-conspirators and/or victims.

## AUTHORIZATION REQUEST

16. Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to 18 U.S.C. § 2703(c) and Federal Rule of Criminal Procedure 41.

17. I further request that the Court direct **SPRINT** to disclose to the government any information described in Section I of **Attachment B** that is within its possession, custody, or control. Because the warrant will be served on **SPRINT**, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

18.     I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation, including by giving targets an opportunity to destroy or tamper with evidence, change patterns of behavior, notify confederates, and flee from prosecution.

_____
GERARD DAUPHINAIS
Special Agent
Drug Enforcement Administration

Subscribed and sworn to before me on this 3rd day of April, 2019

_____
SHON T. ERWIN
United States Magistrate Judge

## ATTACHMENT A

## PROPERTY TO BE SEARCHED

This warrant applies to records and information associated with the cellular telephone assigned call number **214-418-2574**, with **IMSI:310120059494450** ("the **SUBJECT PHONE**"), which is stored at premises controlled by **SPRINT**, a wireless telephone service provider headquartered at 6480 Sprint Parkway, Overland Park, Kansas.

## ATTACHMENT B

## **PATICULAR THINGS TO BE SEIZED**

**Information to be Disclosed by the Provider**

To the extent that the information described in **Attachment A** is within the possession, custody, or control of the Provider, including any information that has been deleted but is still available to the Provider or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Provider is required to disclose to the government the following information pertaining to the Account listed in **Attachment A** for the time period **December 2, 2017 through December 11, 2017**:

a. The following information about the customers or subscribers of the Account:

   i. Names (including subscriber names, user names, and screen names);

   ii. Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

   iii. Local and long distance telephone connection records;

   iv. Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

   v. Length of service (including start date) and types of service utilized;

   vi. Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity

      Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

  vii. Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address); and

  viii. Means and source of payment for such service (including any credit card or bank account number) and billing records.

b. All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the Account, including:

  i. the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses); and

  ii. information regarding the cell tower and antenna face (also known as "sectors") through which the communications were sent and received.

## II. Information to be Seized by the Government

All information described above in Section I that constitutes [evidence, fruits, contraband, and instrumentalities] of violations of 21 U.S.C. § 846; 21 U.S.C. § 841(a)(1); 18 § U.S.C. 2118(b); and 18 § U.S.C. 2 involving **MONSERRATE** during the period **December 2, 2017 through December 11, 2017.**

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Provider in order to locate the things particularly described in this Warrant